UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LINDA M. LEWIS,<br>    Plaintiff, | )<br>)<br>)<br>) |
| v. | )  Civil Actions No.: 05-1507 (GK), |
| MIKE JOHANNS, SECRETARY OF<br>AGRICULTURE, | )  No. 06-0255 (GK), Consolidated<br>)<br>) |
| Defendant. | )<br>)<br>) |

## CONSOLIDATED AMENDED COMPLAINT

### INTRODUCTION

1. Plaintiff Linda M. Lewis was from September, 1992, through October 17, 2005, an employee of the Food Safety and Inspection Service, in the United States Department of Agriculture ("USDA"). Plaintiff, an emergency programs specialist (GM/GS-13) had graduated from the University of North Texas with a 4.0 GPA for a second Bachelor of Science degree in emergency administration and planning. Despite this rare credential and history of high achievement, Plaintiff continuously suffered discrimination and reprisal throughout her USDA career, leading her to file several equal employment opportunity ("EEO") complaints with the Agency's Civil Rights office.

2. This case involves USDA's persistent, abusive and unlawful discrimination on the basis of sex (female), age (currently 56), perceived disability, and of reprisal, violation of privacy, denial of due process and a hostile environment.

1

3. Ms. Lewis, who never received a less than satisfactory performance appraisal and received high praise from peers outside the agency, was denied promotions and selection for positions for which, she is informed and believes, she was best qualified. She was subjected to humiliation and emotional distress, and was denied payment of scheduled within-grade wage increases. Unwarranted and outrageous attacks on her character and competency destroyed not only her USDA career but any likelihood of finding comparable employment elsewhere in her field.

4. Over the course of the Plaintiff's career, USDA committed repeated and willful violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq., as amended ("ADEA"); the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq., the Privacy Act of 1974, 5 U.S.C. $ 522(a) as amended ("Privacy Act"), and anti-discrimination provisions of Executive Order 12968. The agency also denied Ms. Lewis her rights under the U.S. Constitution, including the First, Fifth and Sixth Amendments.

## PARTIES

5. Plaintiff Linda M. Lewis, pro se, is a citizen of the United States and a former employee of the U.S. Department of Agriculture, having retired on October 17, 2005. Ms. Lewis currently resides at 2400 Wynncrest Circle., #20105, Arlington, Texas, 76006.

6. Defendant Mike Johanns, the official representative of the United States Department of Agriculture, is an agency of the United States Government, located at 1400 Independence Avenue, S.W., Washington, D.C. 20250.

## ADMINISTRATIVE PREREQUISITES

2

7. The averments previously set forth are adopted and incorporated herein by reference.

8. On or about February 13, 2002, the EEOC Office of Federal Operations (OFO) found agency error in failing to consolidate Plaintiff's EEO complaint 98005 with her other existing EEO complaints, 970252, 990200, 99086, and 00187, that were then under EEOC review. The OFO then ordered the Plaintiff's complaints consolidated.

9. On October 21, 2003, having failed to rule on Plaintiff's longstanding motion for partial summary judgment, Judge Richard Schneider ordered (see Attachment 1) the Plaintiff's consolidated complaints (EEOC Case No. 100-A1-7163X, Agency Case No. 970252, et al) to be "returned to the Agency for issuance of a final agency decision containing appropriate appeal rights. The Agency apparently never issued a final decision and never informed the Plaintiff of her appeal rights.

10. On May 14, 2004, the Plaintiff filed a new complaint with the FSIS civil rights office. The complaint, No. 050142, was dismissed by the Agency per a decision dated April 15, and received by the Plaintiff on April 30. The Agency based its decision on its erroneous record that the complaint was filed on May 27. The Decision gave the Plaintiff the right to file a civil action within 90 days of receipt.

11. Plaintiff filed additional complaints on December 10, 2004 and March 8, 2005. Plaintiff requested a hearing by the EEOC for the December 10 complaint, EEOC No. 100-2006-00063X), but there has been no decision by the Administrative Judge and more than 180 days have passed since the complaint was filed. The Agency failed either to formally investigate or dismiss the March 8 complaint (Exhibit A), and more than 180 days have passed since the complaint was filed. Plaintiff therefore considered her administrative remedies exhausted pursuant to 29 CFR 1614.407.

3

12. On or about July 29, 2005, the Plaintiff pro se filed in U.S. District Court a complaint referencing Complaint 050142 and referencing the consolidated complaints (100-A1-7163X et al.

13. On or about February13, 2006, Plaintiff pro se filed in U.S. District Court a complaint referencing Complaint 100-2006-00063X and the March 8 complaint.

JURISDICATION AND VENUE

14. The averments previously set forth are adopted and incorporated herein by reference. The United States District Court for the District of Columbia has jurisdiction under 28 U.S.C. Section 1331 since the Plaintiff was a tenured federal employee of the U.S. Department of Agriculture (USDA) when the events occurred.

15. Venue is proper in the District of Columbia judicial district pursuant to 28 U.S.C. Section 1391, 15 U.S. C. Section 78aa and 77v and 7 U.S. C. Section 25c.

FACTS

16. The averments previously set forth are adopted and incorporated herein by reference. The Plaintiff is informed and believes the following facts to be true.

17. On or about Septembe 6r, 1992, the Plaintiff, Linda Lewis, began employment with USDA's Food Safety and Inspection Service ("FSIS") as a Grade 13 emergency programs (planning) specialist, series GM-301, on the Emergency Planning Staff ("EPS"), variously known as the Office of Food Safety and Emergency Preparedness ("OFSEP"), the Office of Food Defense and Emergency Response ("OFDER"), and similar names.

18. The Emergency Planning Staff at that time included Mr. George Bickerton, a Grade 15 supervisor (white male), Mr. Robert Conley, a Grade 13 emergency programs

4

specialist (white male), and Ms. Kecia Cooper, a secretary, believed to be Grade 6 (African-American female). Within approximately two weeks, Mr. Ronald Graham, a Grade 13 emergency programs specialist (white male) also joined the staff.

19. In the first weeks of employment, Supervisor George Bickerton provided Ms. Lewis outdated, trouble-prone computer equipment and introduced her only to staff in the immediate office. In contrast, Mr. Bickerton ordered a new computer system for Mr. Graham and introduced him around to senior officials in other offices. Thus, from the beginning of her USDA employment, Ms. Lewis received less favorable treatment than males on the staff, even males who were junior to her like Mr. Graham. This treatment has persisted throughout Ms. Lewis' employment at USDA.

20. Mr. Graham reportedly lacked an emergency management degree and had no experience with the Radiological Emergency Preparedness Program ("REP") or the Chemical Stockpile Emergency Preparedness Program ("CSEPP"), the two programs that formed the bulk of EPS activities.

21. Mr. Conley also reportedly had no specialized emergency management degree. He had extensive experience with the REP program but little or no experience with the CSEPP program.

22. Ms. Lewis came to USDA with a specialized and then rare Bachelors degree in Emergency Administration and Planning, which she earned with a 4.0 (perfect) grade point average from the University of North Texas, and had worked on the REP and CSEPP for three years at her previous employer, Argonne National Laboratory ("Argonne"). Argonne worked on the REP and CSEPP programs as a contractor for the Federal Emergency Management Agency ("FEMA"), which managed the REP program

5

and the Department of Defense ("DOD"), U.S. Army, which jointly managed the CSEPP

program with FEMA.

23. In January or February, 1993, Ms. Lewis filed an EEOC complaint against

Argonne for discrimination and sexual harassment suffered while in their employment.

Importantly, Argonne employees worked very closely with employees of FEMA, USDA

and other federal agencies, including Ms. Lewis' EPS coworkers. Believing that it would

be better for Mr. Bickerton to hear facts, not rumor, about the complaint, Ms. Lewis

informed Mr. Bickerton of the complaint soon after filing it. On or about March 17, Mr.

Bickerton gave Ms. Lewis a last minute assignment to travel to a Vermont exercise

during a snowstorm and the coldest weather on record. Ms. Lewis was on crutches at the

time, due to a ski injury.

24. Over approximately the next month, Mr. Bickerton and Mr. Conley made

repeated disparaging references to Ms. Lewis about a former agency employee who been

gone public with food safety problems. Mr. Bickerton described how he had been tasked

by senior USDA officials, as high as the Secretary's office, to "handle" the high-profile

employee, whom both men described as a "traitor." On or about April 30, 1993, Mr.

Bickerton cancelled Ms. Lewis' participation in a CSEPP conference, alleging "lack of

funding" (although funding never specifically was identified by USDA for work on the

program), accused Ms. Lewis of not being a "team player," and angrily called Ms.

Lewis a "traitor to the Department," implying that her discrimination complaint against

Argonne somehow was an embarrassment to USDA.

25. In the weeks following that followed, Mr. Bickerton informed Ms. Lewis that

she had also been removed from participation in May training workshops that included

6

Mr. Bickerton and Mr. Graham. On June 25, he notified Ms. Lewis that she was "note needed" to participate as scheduled in emergency exercise for Comanche Peak nuclear power plant. The staff secretary, Kecia Cooper, became noticeably cool toward Ms. Lewis and later explained that Mr. Conley constantly pressured her to avoid contact with Ms. Lewis. Mr. Conley, who had a habit of making risqué comments and jokes to Ms. Cooper in spite of her obvious distaste for them, stopped making the comments when Ms. Lewis was present, but continued them with Ms. Cooper and others.

26. In summer 1993, Ms. Lewis' attorney notified Argonne of intent to sue in U.S. District Court and filed a complaint approximately in August. Over the next couple of months, Ms. Lewis was dropped from approximately three more emergency exercise assignments, with the typical explanation was that she was not "needed" by FEMA officials to conduct evaluations. Notably, Ms. Lewis' male coworkers experienced no similar rejections. Mr. Bickerton acknowledged that the assignment changes were unprecedented, but rejected Ms. Lewis' request to for a redistribution of assignments, wrongly alleging that evaluator assignments could not be changed. This was to become a pattern, whereby Ms. Lewis was excluded from exercises and other assignments, continuing to the last day of her employment at USDA.

27. Each exercise assignment, conducted under FEMA management, lasted roughly a week, and provided many opportunities for participants to associate with emergency management professionals from FEMA and other government agencies and government contractors, including Argonne. Each exercise also included a number of state emergency management officials and employees of FEMA regional offices. The exercises also provided an excellent opportunity for an employee to make contacts

valuable to a career. They also provided an opportunity for someone hostile to Ms. Lewis to devastate her career by spreading false rumors. It was not long before even people Ms. Lewis had never met were indicating to her their awareness of her Argonne complaint. Gradually, it became apparent also that Ms. Lewis' reputation was under attack from her male USDA coworkers and from men at FEMA and Argonne, many of whom had worked together for years and collectively had established a powerful "old boys" network.

28. Over subsequent years, the men enjoyed a greater variety of exercise assignments than Ms. Lewis, a larger number of exercise assignments, and assignments more desirable for their locations or opportunities for networking with senior USDA officials.

29. Over subsequent years, Mr. Conley and Mr. Graham treated Ms. Lewis with contempt, filed false accusations, and avoided cooperating or working with her. They provided false information about Ms. Lewis to Mr. Bickerton and others, for example claiming she was late to work when she was on time. Ms. Lewis' pleas to Mr. Bickerton to put a stop to the hostility failed to produce meaningful relief.

30. By early 1995, the hostile environment in EPS had become unbearably stressful, and Ms. Lewis requested a detail to another office in the agency and FSIS personnel officer Roslyn Robinson arranged for a detail to the agency's public affairs office. After the detail ended, about three months later, the agency urged Ms. Lewis to apply for a permanent position in that office. Ms. Lewis gave the offer serious consideration but, after hearing from another source that the public affairs office had an uncertain future, Ms. Lewis decided against it. Months later, Ms. Lewis learned that the

8

agency was eliminating all positions like the one she had been offered, forcing incumbents to find new jobs. Ms. Lewis returned to EPS in approximately June, 1995.

31. In July, 1995, Argonne made an out-of-court settlement with Ms. Lewis. To Ms. Lewis' surprise, the men in EPS seemed to resent her successful resolution of the lawsuit.

32. Approximately late September, 1995, Ms. Lewis learned from USDA employee Lisa Volk that Mr. Conley and Mr. Graham had been making negative remarks about her to Ms. Volk and others who participated in a two-week-long national emergency exercise ("Display Select") held in Yorktown, Virginia. Ms. Volk states in an affidavit, "Mr. Conley's and Mr. Graham's behavior was so unprofessional I was appalled," and adds, "Throughout my contact with Mr. Conley and Mr. Graham, they tried to make Ms Lewis out as an awful person."

33. In late November or early December, 1995, Ms. Cooper, the EPS secretary, told Ms. Lewis that she was increasingly upset by Mr. Conley's "filthy jokes." Sometimes, she said, Mr. Conley told the jokes in the presence of Mr. Graham or Latasha Barnes. Ms. Barnes, presumably in her teens, worked part-time in the office as part of the agency's stay-in-school (high school) program. Ms. Cooper was upset, also, that Mr. Bickerton had just given Ms. Barnes, as a Christmas present, a battery-operated vibrator shaped like a mouse. The knowledge that this was going was hurtful also to Ms. Lewis because it reminded her of hurtful experience at Argonne and left her feeling vulnerable.

34. Subsequently, Ms. Cooper informed Ms. Lewis that she had asked Mr. Bickerton to intercede to have Mr. Conley stop telling his raunchy jokes. Mr. Bickerton's response, she told the Plaintiff, was to claim that Ms. Cooper was too

9

sensitive. Afterward, the Plaintiff overheard Mr. Conley on the telephone, disparaging and deriding Ms. Cooper and Ms. Lewis to an unidentified individual who apparently worked in the emergency management field. Within earshot of her coworkers, Mr. Bickerton threatened to fire Ms. Lewis allegedly for influencing Ms. Cooper's decision to complain about Mr. Conley's behavior. Shortly thereafter, Ms. Lewis contacted the FSIS civil rights office and filed a complaint against George Bickerton.

35. In early 1996, Mr. Conley took extended sick leave, and the environment in EPS improved noticeably, motivating Ms. Lewis to drop her informal EEO complaint. When Mr. Conley returned to duty around the end of summer, however, the environment again worsened. Ms. Lewis noticed that Mr. Conley and Mr. Graham were busy with a growing number of assignments, while hers had been dwindling. After Mr. Bickerton demonstrated unwillingness to discuss the subject with Ms. Lewis, Ms. Lewis filed a new complaint with FSIS' civil rights office, which the agency later alleged it lost.

36. Ms. Lewis participated as an evaluator at the October 23-24, 1996, Salem emergency exercise in Delaware, where she and a male evaluator reported state preparedness inadequacies that posed a threat to public health and safety. State officials immediately rejected all criticism of their plans and performance and demanded that FEMA officials give them a perfect score – almost unheard of in exercise evaluations – on the official FEMA evaluation report. Although Ms. Lewis' demeanor has been described as professional, state officials aggressively attacked Ms. Lewis' findings, and a FEMA official told her to sit down and be quiet. The male evaluator who found problems, who was employed by Argonne, received more professional treatment and was allowed to complete his report.

37. After the findings were presented, the FEMA official, Janet Lamb, told Ms. Lewis, in front of other evaluators, that she had "no business" finding fault with senior state officials or finding fault with a plan that had just been reviewed (by a male Argonne employee) and approved by FEMA. Ms. Lamb wrongly alleged that plans could not be changed after approval had been given and continued to fume, comparing Ms. Lewis unfavorably to Mr. Conley who "never finds problems" at exercises. Ms. Lamb ordered all of the documented inadequacies excluded from the official report. Ms. Lamb reportedly was friendly with one of the Argonne men named in Ms. Lewis' sexual harassment lawsuit and had come to the exercise directly from a meeting with George Bickerton.

38. Ms. Lewis reported the incident to Mr. Bickerton immediately upon returning from the exercise, and in October 28 memo; but he demonstrated little concern about either Ms. Lewis's humiliating treatment or the coverup of safety issues. Subsequently, Ms. Lewis informed Mr. Bickerton that she would file an EEO complaint if he did not address these problems constructively with FEMA.

39. In a November 13 phone call, Ms. Lamb informed Ms. Lewis, in a hostile tone of voice, that she would not be "needed" for an upcoming emergency exercise in Region III. Because each agency's civil rights office insisted that the other was responsible for handling such problems, Ms. Lewis filed complaints with each of them (at USDA on or about November 14, 1996; at FEMA on or about December 16, 1996).

40. On or about January 16, 1997, Mr. Bickerton provided Ms. Lewis with a FEMA letter, dated November 20, 1996, that, while acknowledging that "Ms. Lewis was not unprofessional at any time," declared her persona non grata at future Region III and

11

Delaware emergency exercises. The letter alleged that Ms. Lewis "did not a full understanding" of plans and procedures, and ignored the fact that FEMA officials at the exercise had reviewed and approved Ms. Lewis' evaluation report prior to rejecting it without consulting Ms. Lewis.

41. Marty Simonin, the male evaluator, later told Ms. Lewis that he was never excluded from Region III activities as she was, although FEMA rejected his report, also. Mr. Bickerton failed to take constructive action to stop FEMA's discrimination and retaliation against Ms. Lewis. Instead, he, too, began making unfair criticisms of Ms. Lewis's performance, while refusing to give Ms. Lewis a performance appraisal for the recently ended fiscal year.

42. In early 1998, FEMA began its formal investigation of Ms. Lewis' complaint filed with that agency's civil rights office. On or about February 3, Ms. Lewis informed Mr. Bickerton of the complaint investigation by telephone. The same day, an email by Roslyn Robinson documented that Mr. Bickerton was recommending that the agency order a fitness for duty exam for Ms. Lewis. Other emails sent between February 8 and 12 indicate that Ms. Robinson was actively soliciting negative information on the Plaintiff from other USDA officials.

43. In approximately early May, 1997, at a one- or two-week long national emergency exercise ("Digit Pace"), held in Albuquerque, New Mexico, Mr. Conley and Mr. Graham disparaged the Plaintiff to Lisa Volk and other exercise participants from around the country. Among other things, Ms. Volk said, the men alleged that they were doing Ms. Lewis' share of the work.

12

44. Following the Digit Pace exercise, Ms. Lewis called the agency's civil rights office and asked to file a complaint. Minutes after she hung up, Mr. Bickerton stormed into her office and angrily threatened to put a stop to her complaints. After he left, Ms. Lewis immediately informed Mr. Simmons, a civil rights officer, of the threats. Without telling Ms. Lewis, Mr. Simmons apprised Mr. Bickerton of her allegations, but the agency apparently did not take any action to discipline Mr. Bickerton. Subsequently, Ms. Lewis filed a complaint with the civil rights office.

45. At the end of the complaint counseling phase, Ms. Lewis informed the counselor that she would be filing a formal complaint and subsequently did so upon receiving the Agency's September 10 notice of right to file. On September 12 and 17, 1997, respectively, Mr. Conley and Mr. Graham made vague allegations to FSIS officials that Ms. Lewis posed a physical threat, although she had no history of harming or threatening to harm anyone. Ms. Lewis is a petite woman of 5 feet 3 inches who has never owned a weapon. In contrast, Mr. Conley and Mr. Graham are military veterans, and Mr. Bickerton had specifically threatened Ms. Lewis. Nevertheless, FSIS officials ignored Ms. Lewis' report of Mr. Bickerton's threat and immediately responded to the false allegations by Mr. Conley and Mr. Graham, sending a thank you letter to Mr. Conley, but failed to notify Ms. Lewis of the outrageous allegations. Instead, on or about September 17, 1997, Mr. Bickerton alleged that Ms. Lewis was "moody" and needed to smile more. In addition, he forbade Ms. Lewis from seeking help from outside the EPS office.

46. On September 28, 1997, Ms. Lewis brought the Salem incident to the attention of the office of U.S. Senator Joseph Biden, of Delaware. Although she told no

13

one about her contact with the Senator, on November 3, Mr. Bickerton called her into his office and informed her that he and senior government officials were aware of her communication to "a certain senator." He told Ms. Lewis that, as a result, she might never again work in FEMA Region III.

47. Over the next several weeks, Ms. Lewis became the target of more false accusations from EPS employees. On the afternoon of the last workday before the Thanksgiving holiday, George Bickerton left a Letter of Caution on Ms. Lewis' desk containing false allegations by the new secretary, Betty Barrett, that Ms. Lewis had been abusive to her. Ms. Barrett later disclosed to Ms. Lewis that she was encouraged to apply for the EPS position by a Agency personnel officer, reportedly Roslyn Robinson. Ms. Robinson and other Personnel officers repeatedly aided retaliation against Ms. Lewis over the course of their and her employment.

48. FSIS personnel officials took seriously each of the accusations against Ms. Lewis, in sharp contrast to their failure to take constructive action when Ms. Lewis complained of discriminatory or retaliation. Ms. Lewis' requests for the agency to question witnesses, like Latasha Barnes, who supported her account of events, were ignored.

49. On or about February 25, 1998, after Ms. Lewis had described the ongoing EPS reprisal to Mr. Bickerton's supervisor on January 26, Ms. Lewis wrote to John Korona that she expect reprisal on Friday, the 27th, based on a pattern of reprisals. On that Friday, Mr. Conley gave Ms. Lewis an order to go to a nearby lab for a drug test. Once there, the lab staff treated Ms. Lewis very abusively and when she objected, they suggested not taking the test. Ms. Lewis, who had never used illegal drugs, knew she

could be fired for not taking the test, so tolerated the abuse and took the test, which she passed. Despite this proof that Ms. Lewis had not been abusing drugs, Ms. Lewis was presented on April 8 with a statement from a lab employee who implied that that Ms. Lewis was a drug addict and made other false and humiliating accusations.

50. Importantly, Ms. Lewis had complained about abusive treatment of her and other visitors by lab staff on multiple occasions, which Mr. Bickerton acknowledged; but the agency had never taken action to protect Ms. Lewis from abuse. Agency officials refused Ms. Lewis' request to question witnesses who had filled the waiting room that day and instead relied on contradictory statements from two employees at the lab, under contract to the government.

51. In early March, agency personnel officials ordered a reinvestigation of Ms. Lewis' security clearance and contacted USDA's Chief Medical officer about ordering Ms. Lewis to take a mental status or fitness for duty exam.

52. On or about June 9, Mr. Bickerton responded to an email from Roslyn Robinson seeking information about Ms. Lewis's allegations that the men received "more/better work assignments." Failing to respond to the request, Mr. Bickerton instead asks: "Where do we stand on the letter. John McCutcheon inquired the other day and has instructed me to not let it die." This appeared to be a reference to a proposed letter of reprimand for the lab incident.

53. Ms. Lewis denied the lab allegations several times, verbally and in writing, but the Agency repeatedly confronted her with the allegations. The Agency sought to force Ms. Lewis, on June 15, to agree to an "alternative disciplinary agreement," allowing Roslyn Robinson, a personnel officer, to consult with Ms. Lewis' psychologist

15

who was seeing her for work-related stress. On or about July 9, 1998, the FSIS Personnel office issued a proposal of reprimand to Ms. Lewis. This was approximately a week after Ms. Lewis emailed senior FSIS official Richard Beck notice she was filing an EEO complaint against the Personnel office for violating policy and procedure in the handling of the accusation, and after Mr. Beck forwarded the email to Roslyn Robinson

54. After Ms. Lewis rejected the agency's proposal, a violation of her right to privacy, and again denied the allegations, Roslyn Robinson contacted Ms. Lewis to inform her that a reprimand had been drafted and would be delivered to her at her office. But, the reprimand, which contained insulting, false allegations and highly private information, mysteriously disappeared in delivery to Ms. Lewis' office, before it reached Ms. Lewis' hands. Ms. Lewis has been informed by two people, including Lisa Volk, that USDA officials, including Robert Conley, have spread similar information inside and outside the agency.

55. In September or October, 1998, Ms. Lewis accepted a detail, arranged by Roslyn Robinson, to the Foreign Equivalency Staff, supervised by Sally Stratmoen. Ms. Lewis was promised that she would receive training for the new position but, ultimately, she never received the training and, according to sources, she was the only person on the staff denied it.

56. FSIS re-issued the reprimand proposal to Ms. Lewis on Nov 19 and on Dec 11, on the eve of major holidays, to no purpose except to cause emotional distress to the Plaintiff and later claimed that by failing to reject the accusations for at least the fourth time, Ms. Lewis had admitted to them.

16

57. On January 4, the same day USDA acknowledged receipt of Ms. Lewis' formal complaint against the Personnel Office, filed roughly two weeks earlier, the Personnel Office issued a formal reprimand to Ms. Lewis.

58. Initially, Ms. Stratmoen appeared pleased with Ms. Lewis' performance on the detail. But, in January, 1999, after Ms. Lewis requested leave on January 6 to meet with an attorney regarding her EEO complaint, Ms. Stratmoen grew increasingly hostile toward Ms. Lewis, putting her down at meetings and making unreasonable demands of Ms. Lewis.

59. In late January, Ms. Stratmoen insisted that Ms. Lewis approve Panama's application to export meat to the United States, despite the absence of evidence that Panama had met U.S. regulatory requirements. Much of the file had never been translated from Spanish to English, and Ms. Stratmoen refused to allow Ms. Lewis, whose Spanish is minimal, to have contractors translate it per usual procedure. Ms. Lewis said she thus could not provide the confirmation Ms. Stratmoen demanded. Subsequently, Ms. Stratmoen had Ms. Lewis moved to an office where excess and broken furniture was being stored.

60. In approximately the first week of February, Ms. Stratmoen proposed making life much more difficult for Ms. Lewis, who was struggling with perimenopause and fibromyalgia, and Ms. Lewis informed her that she was considering filing a new civil rights complaint. Ms. Stratmoen quickly cancelled Ms. Lewis's detail.

61. On or about February 8, Ms. Lewis was ordered her to gather her personal things, leave the building and stay home on administrative leave until she heard from the

17

agency. For about a week, Ms. Lewis remained on administrative leave, with no word from the agency regarding her fate and no reasonable explanation for being sent home.

62. Finally, the agency told Ms. Lewis to return to work on the EPS staff, but at an office distant from where the other staff worked. Ms. Lewis was given an office in a room that previously was a closet and was located inside a larger office used to store excess and broken furniture. For weeks, she received no assignments and had no work to perform. During this time, Mr. Bickerton accepted a promotion to a Department level emergency preparedness office and Mr. Conley took over as Director of EPS.

63. In approximately late February and in early March, 1999, USDA officials proposed suspending Plaintiff's security clearance and ordering a mental fitness for duty exam based on alleged sub-par performance, although Ms. Lewis had just received, in December, a fully satisfactory performance appraisal from Mr. Bickerton. Emails show that personnel officer Roslyn Robinson pressured USDA's Chief Medical Officer, Dr. O. I. Jacekewycz, to cooperate with an examination despite his objections that it wasn't necessary. On April 12, 1999, the agency issued a letter informing the Plaintiff that her security clearance had been suspended (for reasons unspecified) and ordering her to complete a mental fitness for duty exam, the confidential results to be evaluated by USDA's Chief Medical Officer, Dr. O. I. Jacekwycz ("Dr. J").

64. The agency already had in its possession an investigator's security clearance reinvestigation report that was ordered by the agency in a March 5, 1998 letter. The report included statements from mental health specialists who had seen Ms. Lewis for work-related stress and depression and had confirmed that they knew of no basis to deny Ms. Lewis a clearance. The report also included statements from coworkers who

indicated Ms. Lewis was untrustworthy because she filed EEO complaints. The agency's suspension of Ms. Lewis' security clearance, per an April 12 letter, and later revocation, thus violated E.O. 12968, which forbids discrimination "on the basis of race, color, religion, sex, national origin," and states that "no negative inference concerning the standards in this section may be raised solely on the basis of mental health counseling." USDA failed ever to provide a detailed explanation of the basis for taking away Ms. Lewis' clearance. In all of its actions, USDA failed to consider Mr. Lewis' perimenopause and fibromyalgia disabilities.

65. On or about April 25, 1999, Mr. Lewis was ordered to attend a meeting with Robert Conley, Ronald Hicks, Cynthia Mercado, Roslyn Robinson and Charles Danner to discuss the transfer of EPS to Mr. Danner's Policy staff. At the meeting, Ms. Lewis was informed that she was not being allowed to work on REP exercises because she had filed an EEO complaint against FEMA. None of the USDA officials present objected to this obviously illegal action.

66. With the approval of Dr. J, Ms. Lewis provided letters to him from her health providers, and an assessment by Dr. Donald Soeken, as proof of mental status. Based on these, Dr. J issued a memo on or about June 1, 1999, recommending the restoration of Ms. Lewis' clearance. Documents provide by USDA and Dr. J's later testimony show that USDA's handling of the fitness for duty exam, from start to finish, violated agency policy and federal regulations.

67. In approximately June, Ms. Lewis was ordered to report to a new office, where she was soon placed under the supervision of Lori Thomas, recently temporarily appointed acting Director of EPS. Mr. Danner refused to tell Ms. Lewis when her

19

clearance would be restored as Dr. J had recommended.  Instead, on June 9 and at least one additional occasion, Mr. Danner proposed that Ms. Lewis drop all of her discrimination and reprisal complaints.  If she did so, Mr. Danner said, she could expect the agency treat her favorably and harassment would end.

68.  In the new office, Ms. Lewis was assigned to work in a support role to a male employee on Mr. Danner's staff who was in charge of developing a continuity of operations plan for FSIS.  Neither the individual in charge of the project nor any of the others assigned to the project had emergency planning training and experience.  Ms. Lewis, who had extensive training and experience, was allowed only a minor and subordinate role.

69.  Mr. Danner was out of town for several weeks in June and July, 1999, but when he returned around the first week of August, Ms. Lewis still had not withdrawn her civil rights complaints.  Mr. Danner became hostile with Ms. Lewis, and berated her for not doing all he had asked.  Ms. Thomas indicated to Ms. Lewis that George Bickerton was trying to have Ms. Lewis fired, allegedly because he was upset that Ms. Lewis had arranged, with approval of the official acting in Mr. Danner's absence, for FBI terrorism experts to brief the FSIS staff assigned to prepare procedures for responding to a terrorist attack.

70.  On September 2, 1999, Mr. Danner handed Ms. Lewis a letter putting her indefinitely on administrative leave, again ordering a mental fitness exam, and attaching a a memo from Dr. J, reportedly issued August 10, rescinding his recommendation to return Ms. Lewis' clearance.  Dr. J subsequently stated in deposition that senior USDA

officials, who lacked professional credentials in medicine or psychiatry had ordered him, the Chief Medical Officer, to withdraw the recommendation.

71. As ordered, Ms. Lewis underwent an examination in October, conducted in two parts on October 4 and 8, by Dr. Sarah Reagan, one of several mental health specialists hand picked and prepped by Roslyn Robinson. In that timeframe, on or about October 8, Mr. Danner denied Ms. Lewis' scheduled within-grade increase absent any performance appraisal. Dr. Reagan refused to delay the exam as requested by Ms. Lewis who was sick on the scheduled day. Dr. Reagan repeatedly assured Ms. Lewis that her assessment would not, and could not ethically, be based on opinions of Ms. Lewis' coworkers; but, that is what Dr. Reagan ultimately did. Dr. Reagan denied Dr. Donald Soeken's request to silently observe, as he requested, at the first session with Ms. Lewis. Dr. Reagan conducted an interview then had Ms. Lewis complete several written tests. At the second session, again alone with Ms. Lewis, Dr. Reagan stated that Ms. Lewis had normal scores on every test administered to her.

72. In November and December, 1999, Ms. Lewis wrote letters to the U.S. Senators in her state, describing USDA discrimination and safety issues, which letters were forwarded to the Agency. Subsequently, USDA produced a report by Dr. Reagan falsely alleging that Ms. Lewis had not passed the written tests and falsely alleging that Ms. Lewis had been uncooperative. USDA official Jim Long informed Ms. Lewis by a letter dated January 7, 2000, that, based on Dr. Reagan's report alleging a paranoid personality disorder, Ms. Lewis' security clearance had been revoked. In its details, the letter contradicted the Agency's March 8, 1999, notice suspending Plaintiff's clearance..

21

Neither Long nor any other USDA official has ever identified the person who authorized the revocation.

73. Dr. J has testified that the agency failed ever to allow him to review Dr. Reagan's files or report or to make the recommendation that he says only he is authorized to make. Dr. J has stated in addition that Dr. Reagan, a psychologist, lacked the necessary credentials to conduct the exam, which should have been by a psychiatrist.

74. Ms. Lewis remained on administrative leave, without explanation but with pay, from September 2, 1999, to January, 2003. During that time, she was required to be on call and available to report to duty. She was denied repeated requests for permission to work at part time jobs outside her duty hours, and thus was prevented from accepting a job offer. This worked a financial hardship on Ms. Lewis, who incurred substantial legal expenses as a result of the discrimination and reprisal.

75. On or about December 21, 2000, after Ms. Lewis again complained to U.S. Senators in November, USDA proposed to remove Ms. Lewis from her position, alleging that she needed a security clearance to hold her position. However, Ms. Lewis' job description, as well as the job announcement, had never required a clearance. Ms. Lewis responded, as required, to the proposal, but USDA failed to respond with a decision until January, 2003, when it finally withdrew the proposal without explanation or apology. Throughout the intervening period, Ms. Lewis was unable to make financial or personal plans, and suffered anxiety and distress, knowing that any paycheck could be her last.

76. USDA has repeatedly ignored Ms. Lewis' superior qualifications in her applications for job announcements, including the GS-14 position of Branch Chief, EPS, the GS-14 position of emergency preparedness specialist in the Department's Crisis

Planning and Management Office and the GS-13 position of policy analyst, positions for which Ms. Lewis applied between in 1998 and 1999. Since USDA officials attacked Plaintiff's mental stability, her superior qualifications have been rejected by FEMA and other employers of emergency planners.

77.    USDA delayed providing Ms. Lewis a hearing at which to appeal her security clearance revocation, per her February 2, 2000, request, until June, 2002. When it finally provided the personal appearance required by law, USDA failed to abide by several requirements of federal law, including the requirement to actually allow Ms. Lewis to appear before the judging panel, the requirement to provide Ms. Lewis with a detailed explanation of the charges, and the requirement to make available to Ms. Lewis the evidence against her. USDA has refused all of the Plaintiff's requests to have copies of the original examination notes and papers relied upon by Dr. Reagan. At one point, a USDA official even claimed that Ms. Lewis' medical records were classified. According to Dr. J, Ms. Lewis' medical records are required to be kept in his office. But, USDA will not confirm to Ms. Lewis who has the medical records. USDA correspondence with Congress, including a May 17, 2002, letter has further damaged the Plaintiff's reputation through false and misleading statements regarding the mental status exam and other matters.

78.    USDA returned Ms. Lewis to work at the office (now the Office of Food Security and Emergency Preparedness, or OFSEP) on or about January 27, 2003. But, USDA did not return Ms. Lewis' clearance, nor did it return her to the duties originally assigned to her. She was not allowed to be the USDA point of contact for the CSEPP program or to attend CSEPP exercises or meetings. Those duties were assigned to

23

Matthew Powers, who had never worked on the CSEPP project, and Ms. Lewis was asked to assist him as needed. Ms. Lewis never returned to REP exercise evaluation, although she was allowed to attend exercises in other capacities and review emergency plans for the REP program.

79. Ms. Lori Thomas initially informed Ms. Lewis that USDA was no longer doing REP exercise evaluations. In May, 2004, OFSEP management announced that all OFSEP participation in REP and CSEPP activities would be canceled. By April, 2005, nearly all REP activities were transferred to APHIS employees, who lacked any experience.

80. Plaintiff's supervisors repeatedly demonstrated bias in favor of Ronald Graham, a younger male coworker, in implementing restrictions on travel for training, meetings and exercises, although the Plaintiff's work has been described as superior.

81. On or about March 30, 2004, Ms. Lewis' personnel file containing sensitive information (medical and disciplinary information) was found unattended in an office unrelated to the Plaintiff's. The next day, a secretary in that office handed the file to Betty Barrett in Ms. Lewis' office, who then gave the file to Ms. Lewis. The file contained documents the Agency had never turned over in discovery at the administrative stage, and included previously unknown disparaging information about Ms. Lewis and new details of reprisals, including Charles Danner's order to deny Ms. Lewis a regularly scheduled within-grade increase, a "heavy handed" proposal to have her escorted out of the building under guard and an allegation that Plaintiff was "insane." This incident is one of several showing a pattern of Agency failures to protect and control sensitive

24

personnel and medical records and information regarding the Plaintiff despite complaints from Ms. Lewis and her attorneys.

82. Among the documents in the file discovered March 30, 2004, were documents describing a 1999 USDA plan to retire Ms. Lewis on a psychiatric disability. USDA did not retire Ms. Lewis on a disability, but throughout the remainder of her employment, USDA officials continued to treat Ms. Lewis as if she had a psychiatric disability and to discriminate against her on that basis.

83. On May 14, 2004, the Plaintiff filed an EEO complaint citing the agency's failure to protect sensitive medical and personnel information. Reportedly, by August, 2004, EEO counselors had contacted witnesses and Plaintiff's supervisors regarding the complaint, and in September were making arrangements for mediation.

84. In mid-September, 2004, and without basis, the Agency removed the Plaintiff from her duties as the coordinator of a multimedia emergency exercise, although supervisors had recently praised her work on the project. Supervisors gave the duties to Mr. Graham, who was unfamiliar with the technology required for the project.

85. Unlike her coworkers, Ms. Lewis was precluded from making presentations to senior officials of her own successful work, including presentations for the multimedia emergency exercise, in favor of younger and male coworkers with no history of filing EEO complaints.

86. Plaintiff's second tier supervisor, Perfecto Santiago, told her that she should not expect a second "outstanding" performance appraisal for the appraisal period that had only just begun. Subsequently, Ms. Lewis increasingly was assigned to short-term, low-

profile projects and was left out of the loop regarding developments related to her office and work.

87. On October 22, 2004, the Agency issued the Plaintiff a reprimand for late payment of her government issued credit card. The reprimand was issued without providing due process required by regulation and without addressing mitigating factors. The Plaintiff's supervisor caused needless emotional distress by handing the reprimand to Ms. Lewis minutes after acknowledging that her work was outstanding.

88. On or about October 22, 2004, the agency announced the availability of a new position, Physical Scientist (GS-1301-14, reporting to Dr. Maczka. The Agency failed to promote the Plaintiff or to hire her for the position, or even respond to her application, despite Plaintiff's having successfully performed the duties since 1992, but for lower pay.

89. Plaintiff observed that supervisors typically denied her prestigious and career-enhancing assignments while giving them to less qualified employees who were younger, had no perceived or real disability, had not engaged in protected activities, and in some cases also were male.

90. On or about December 10, 2004, Plaintiff filed a new complaint with the civil rights office.

91. In January 2005, after informal investigation of Plaintiff's December EEO complaint began, Agency officials including Suzanne Rigby, isolated the Plaintiff by restricting her from communicating with supervisors and co-workers, and restricting her interaction with senior government officials.

26

92. In late January, 2005, the Plaintiff requested a copy of her official personnel file ("OPF") and upon receipt discovered that Agency officials were disparaging her through inaccurate personnel files that excluded positive information, such as awards and an "outstanding" performance appraisal, and included negative information, such as denial of a within-grade increase, for which no due process had been accorded, thus prejudicing Plaintiff's prospects for promotion or finding alternative employment.

93. On March 8, 2005, the Plaintiff filed a new complaint of discrimination and reprisal.

94. Coworker Merritt Lake, who joined the staff in approximately December, 2004, informed the Plaintiff that Agency officials, including Dr. Carol Maczka, were disparaging the Plaintiff's mental stability, for example telling co-worker(s) she was "crazy" or "nuts," and were denying the Plaintiff training and assignments based on the perceived disability. Supervisor Carol Maczka, Assistant Administrator, OFSEP, later stated in an affidavit that the Plaintiff was precluded from applying for a security clearance and from being assigned to Recorder duty.

95. In late June, 2005, OFSEP's name was changed to the Office of Food Defense and Emergency Response ("OFDER").

SUMMARY

96. From the first couple weeks at USDA, and thereafter, Plaintiff Linda Lewis experienced continuous discrimination. Retaliation for her protected activities, including attacks on her character, continued from the first months of 1993 until her last day and reportedly after. Even the demands of terrorist attacks on September 11, 2001, Hurricane

27

Katrina in August and September, 2006, did not motivate shorthanded Agency officials to cease their marginalization of her.

97.  In pain and despair, Plaintiff Linda Lewis submitted her notice of resignation, which became effective October 17, 2005.

## Count I

### (Sex Discrimination in Violation of Title VII)

98.  The averments previously set forth are adopted and incorporated herein by reference.

99.  The acts of the USDA previously outlined, including, not limited to failing to promote and disparagement of plaintiff, constitute willful, intentional and unlawful discrimination against Ms. Lewis, based on her sex, in violation of Title VII.

100.  As a result of USDA's willful, intentional and unlawful discrimination on the basis of sex, Ms. Lewis has suffered and will continue to suffer financial hardship, severe emotional and mental distress, loss of wages and benefits, and loss of employment opportunities and advancement.

## Count II

### (Retaliation for Exercising Protected Rights in violation of Title VII)

102.  The averments previously set forth are adopted and incorporated herein by reference.

103.  The acts of the USDA previously outlined, including, not limited to threats, failing to promote, taking disciplinary action without due process, and disparagement of the Plaintiff, constitute willful, intentional and unlawful discrimination against Ms.

28

Lewis, based on her previous exercise of a protected right when she filed a discrimination complaint, are in violation of Title VII.

104. As a result of USDAs willful, intentional and unlawful discrimination against Ms. Lewis, based on her sex, in violation of Title VII, Ms. Lewis has suffered and will continue to suffer financial hardship, severe emotional and mental distress, loss of wages and benefits, and loss of employment opportunities and advancement.

### Count III

(Age Discrimination in Violation of the ADEA)

105. The averments previously set forth are adopted and incorporated herein by reference.

106. The acts of the USDA previously outlined, including, not limited to failing to promote and disparagement of plaintiff, constitute willful, intentional and unlawful discrimination against Ms. Lewis, based on her age, and are in violation of the ADEA.

107. As a result of USDAs willful, intentional and unlawful discrimination against Ms. Lewis, based on her age, in violation of the ADEA, Ms. Lewis has suffered and will continue to suffer financial hardship, severe emotional and mental distress, loss of wages and benefits, and loss of employment opportunities and advancement.

### Count IV

(Disability Discrimination in Violation of the Rehabilitation Act of 1973)

108. The averments previously set forth are adopted and incorporated herein by reference.

109. The acts of the USDA previously outlined, including, not limited to failing to accommodate, disparagement of plaintiff, failing to promote and failing to protect

information regarding medical examinations, constitute willful, intentional and unlawful discrimination against Ms. Lewis, based on a perceived disability, and are in violation of the Rehabilitation Act of 1973.

110. As a result of USDA's willful, intentional and unlawful discrimination against Ms. Lewis, based on a perceived disability, in violation of the Rehabilitation Act of 1973, Ms. Lewis has suffered and will continue to suffer financial hardship, severe emotional and mental distress, loss of wages and benefits, and loss of employment opportunities and advancement.

Count V

(Executive Order 12968)

111. The averments previously set forth are adopted and incorporated herein by reference.

112. The acts of the USDA previously outlined, including, not limited to failing to consider Ms. Lewis for renewal of her security clearance without discrimination, constitute willful, intentional and unlawful attempts to violate Ms. Lewis' rights to be considered for renewal of her security clearance without discrimination, and are in violation of Executive Order 12968.

113. As a result of USDA's willful, intentional and unlawful violation of her right to nondiscriminatory consideration for a security clearance, as described in E.O. 12968, privacy, Ms. Lewis has suffered and will continue to suffer financial hardship, severe emotional and mental distress, loss of wages and benefits, and loss of employment opportunities and advancement.

30

Count VI

(U.S. Constitution:  First, Fifth and Sixth Amendments)

114.  The averments previously set forth are adopted and incorporated herein by reference.

115.  The acts of the USDA previously outlined constitute willful, intentional and unlawful attempts to violate Ms. Lewis' rights under the U.S. Constitution's First, Fifth and Sixth Amendments.

116.  As a result of USDA's willful, intentional and unlawful violation of her Constitutional rights, Ms. Lewis has suffered and will continue to suffer financial hardship, severe emotional and mental distress, loss of wages and benefits, and loss of employment opportunities and advancement.

PRAYER FOR RELIEF

117.  Wherefore, Ms. Lewis requests judgment against the United States Department of Agriculture, and prays:

A.  That this court direct the USDA to take such affirmative action as necessary to mitigate past attacks on Ms. Lewis' reputation and to ensure that Ms. Lewis' competency and character are not disparaged to potential employers and others;

B.  That this Court order award Ms. Lewis reasonable attorney's fees and any other costs of defending herself from discrimination and reprisal;

C.  That this Court award Ms. Lewis award full back pay and front pay, including salary, benefits, and other entitlements retroactive to the date of any unlawful denial of promotion, and the value of lost career opportunities;

31

D.     That this Court award Ms. Lewis damages for humiliation and

emotional distress;

E.     That this Court award compensatory damages;

F.     That this Court award Ms. Lewis punitive damages and such other

and further relief as may be deemed just and equitable.

## JURY DEMAND

85. Plaintiff requests a trial by a jury of her peers as to all claims set forth I this

Complaint.

Respectfully submitted,

*Linda M. Lewis*

Linda M. Lewis, Plaintiff pro se
2400 Wynncrest Circle, #10105,
Arlington, TX  76006
(202) 210-8539