UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LINDA M. LEWIS,<br>　　　Plaintiff<br>　　　　v.<br>MIKE JOHANNS, SECRETARY OF<br>AGRICULTURE,<br>　　　Defendant | )<br>)<br>)<br>)  Civil Action No.: 05-1507 (GK)<br>)  　　　　　　　　06-0255 (GK) (con)<br>)<br>)<br>) |

**REVISED AFFIDAVIT OF LINDA M. LEWIS, PLAINTIFF**

1. My name is Linda M. Lewis, and I am the Plaintiff in this civil action.

2. I was employed at the U.S. Department of Agriculture from September, 1992 to October, 2005, as a GM-13 Emergency Preparedness Specialist/GS-13 Program Analyst, in the Food Safety and Inspection Agency.

3. This affidavit, which replaces my previous affidavit, describes the nature of my complaints based on my personal observations of events and documentation, and certifies that the attached documents are, to the best of my knowledge, true and correct copies.

4. The facts set forth in my Complaint describe an obvious pattern of discrimination based on my gender (female), age (over 40), and perceived (mental) disability, and retaliation for my protected prior protected activity.

5. Upon information and belief, my prior protected activity was known to supervisors George Bickerton, Charles Danner, Ronald Hicks, Sally Stratmoen, Roslyn Robinson, Robert Conley, and other USDA officials when they took adverse actions against me.

1

6. The animus toward my prior protected activity was institutionalized according to Charles Danner, who told me in approximately June, 1999, that I could expect better treatment from "the Agency" if I dropped my civil rights complaints. See Consolidated Amended Complaint ("Compl.") ¶ 67.

7. Direct evidence of illegal animus toward my protected activities exists in male supervisor George Bickerton's threat to fire me, within earshot of my coworkers, for allegedly convincing another female employee to complain about sexual harassment in approximately late December, 1995. See Compl. ¶ 34.

8. Direct evidence of illegal animus toward my protected activities exists in the comments of male supervisors Charles Danner, Robert Conley and Ronald Hicks, on or about April 25, 1999, when they informed me that I would not be allowed to participate in activities of the Radiological Emergency Preparedness program because I had filed a civil rights complaint against FEMA; See Compl ¶ 65.

9. Direct evidence of illegal animus toward my protected activities exists in George Bickerton's angry threat to "put a stop to my complaints" on June 12, 1997; See Compl ¶ 44.

10. Direct evidence of illegal animus toward my protected activities exists in an OPM report for a reinvestigation of my security clearance suitability in August-September, 1998. See Compl ¶ 64.

11. The OPM report includes direct evidence of illegal disability animus by Robert Conley, who was named in my EEO complaints, and told the investigator that I was "always using sick leave," and alleged that it was probably a "result of substance abuse," even though I took annual drug tests for my job, had passed every one of them, and had never abused drugs.

2

12. The OPM report includes direct evidence of illegal disability animus by Ronald Graham, who was named in my EEO complaints, and who alleged that I had a "substance abuse problem" which he based on "a sickly look that she has sometimes."

13. As interpreted by the OPM "Suitability Referral Chart," the OPM report includes direct evidence of illegal animus toward a disability in its assessment of comments made by four psychologists who had treated me; although each said there was no reason to question my judgment and reliability, the investigators report gave that information an "E" rating, typically applied for "disturbing the peace" and "employment related misconduct."

14. The OPM report includes direct evidence of illegal animus toward prior protected civil rights activity in its assessment of my EEO complaints," which it gave an "A" rating, a rating typically applied to "evidence of dishonesty or fraud."

15. Illegal animus can be inferred from the close nexus in time between my protected activities and adverse actions by Agency officials aware of my protected activity.

16. After I wrote a letter to Senator Barbara Mikulski in November-December, 1999, to complain about USDA discrimination and retaliation for my protected activities, the Agency revoked my security clearance on January 27, the same day it was preparing a response to the Senator's inquiry on my behalf, as documented in an email by personnel officer Roslyn Robinson. See Compl ¶ 72.

17. Approximately one day after Roslyn Robinson became aware that I planned to file a complaint of discrimination against her and other Agency personnel officials for biased treatment of (false) allegations against me by employees of an agency contractor, she issued a proposed letter of reprimand based on the allegations despite previously assuring my attorney that the Agency would not issue one.

18. Within days of a meeting with Sally Stratmoen when I told her that I would consider filing a complaint with the civil rights office if she refused to reasonably accommodate my fibromyalgia and perimenopause, Ms. Stratmoen on DATE placed me on administrative leave without explanation, and ordered me to leave the building with my personal belongings as if I had been terminated for misconduct.

19. When Charles Danner returned from vacation around the beginning of August, 1999, and I still have not withdrawn my EEO complaints as he had requested, less than a month later, Mr. Danner alleged in memoranda that I had a mental disability, issued a memo rescinding my appointment as Acting Branch Chief, a GS-14 position; and, less than two months later, issued an order denying my scheduled within-grade increase (WIGI), although I had received no negative performance appraisal – or any appraisal – for that year.

20. USDA eventually paid the WIGI for that year, but kept Mr. Danner's order in my personnel file for approximately 6 years or more; which the Agency apparently relied upon to deny every subsequent WIGI while providing me none of the notice and due process required by agency and OPM regulations and procedures.

21. After I retired from the Agency, USDA officials paid the past due salary increases, but, per OPM correspondence, USDA failed to provide OPM with the updated, correct yearly salaries, thus potentially reducing my retirement pay, based on the three highest annual salaries, for life.

22. The Agency failed to accommodate any disability, whether real or perceived.

23. Agency officials were aware that I had received mental health counseling for work related stress and depression.

4

24. My counseling history was disclosed (as required) on my security clearance applications which were submitted to the Agency through my supervisors, and in (OPM) security clearance investigation reports accessible to Agency officials including acting security officer Jim Long. See Compl ¶ 64.

25. My counseling history was disclosed in letters provided by health care providers submitted in response to the Agency's first demand for a fitness for duty examination and, upon information and belief, this information was known by Agency officials including Roslyn Robinson and Ronald Hicks. See Compl ¶ 66.

26. My counseling history and the Agency's unfounded allegations and inferences of mental instability were disclosed to potentially every USDA employee through repeated incidents of "lost" or "misplaced" documents and through deliberate disclosure by agency officials to other USDA employees, including, but not limited to, supervisors Robert Conley and Carol Maczka, according to emails, conversations and affidavits of Lisa Volk and conversations and Merritt Lake's statement in the Agency's Report of Investigation (ROI). See Complaint.

27. Evidence that USDA officials regarded me as mentally disabled exists in allegations that I was "insane," "crazy," and "disturbed" and is documented in Merritt Lake's statement for the Agency's ROI, the Agency's "evidence file" provided to contractor Sarah Reagan. Also, See Exhibit A of Plaintiffs original Complaint in 05-1507 (GK).

28. Evidence that USDA officials had a biased view of my mental status is implied in the Agency's demand for a mental status examination AFTER it had received assurances of mental stability from a psychiatrist and multiple psychologists. See Complaint and Exhibit A, Complaint, 05-1507 (GK) filed July 29, 2005.

5

29. Despite assurances from two psychiatrists and five psychologists that I had no disqualifying mental instability, USDA officials persisted in alleging that I have a mental disability disqualifying me for a security clearance and making me unsuitability to perform normal duties of my position. See Exhibit A, Complaint, 05-1507 (GK) filed July 29, 2005.

30. USDA's perception of a mental disability influenced its "choice of weapon" in retaliating for my EEO complaints.

31. USDA officials first considered ordering me to take a "fitness for duty" or "mental status exam" after I told supervisor George Bickerton that investigation was proceeding on a formal EEO complaint I had filed against the Federal Emergency Management Agency, with whom our office closely worked. See Complaint.

32. USDA officials suspended my security clearance, based on vague allegations, and ordered a mental status exam in the early weeks of 1999, not long after I had filed a formal EEO complaint against Personnel (Employee Relations) officials, and had filed a new, informal EEO complaint in approximately February 1999 that the Agency apparently ignored. See Complaint.

33. After receiving letters from a psychiatrist and multiple psychologists who had seen me over an extended period of time, the Chief Medical Officer concluded that I had no disqualifying mental condition and issued a June 1, 1999 memo recommending the return of my security clearance.

34. Approximately two or three weeks later, Charles Danner, suggested I withdraw my EEO complaints.

35. In late July to early August, 1999, after I had not withdrawn the complaints, USDA officials with no known medical qualifications ordered Dr. Jacykewicz to rescind his June 1 findings.

6

36. After I complained of harassment from supervisors in August, 1999, USDA officials, including harassing supervisor, Charles Danner, met and decided my fates. See Exhibit A, Complaint, 05-1507 (GK) filed July 29, 2005.

37. On September 2, 1999, Charles Danner handed me a letter that, without explanation, placed me on paid administrative leave and demanded a second mental status evaluation, this time by a contractor psychologist hand-picked by Roslyn Robinson.

38. Emails and deposition testimony by Roslyn Robinson and Dr. Jackywycz show that the second mental status exam was conducted in violation of Agency regulations and procedures when it denied any involvement by Dr. Jacykewycz, the Chief Medical Officer, the only USDA official authorized to evaluate medical or psychological reports, and was conducted by a psychologist not a psychiatrist.

39. In violation of agency procedure, the Rehabilitation Act and the Privacy Act, the medical file was never filed, as required, with the Chief Medical Officer, per deposition of Dr. O. I. Jacykewycz, and my repeated requests for the complete file were denied by USDA officials who claimed no control over the records and showed no interest in locating them.

40. The forced administrative leave, with pay, would last nearly 3 ½ years, from September 2, 1999, to January, 2003, and the Agency would never provide a non-discriminatory reason – or any reason – for its action.

41. In the interim, I had asked to return to work, but the Agency had ignored my requests and thus failed to accommodate a perceived mental disability.

42. Forced administrative leave lasting 3 ½ years was harmful because it denied me training, professional associations and opportunities for advancement during a period of major change in my profession; because it discouraged others from employing me at a time when

salaries and opportunities for advancement increased greatly for individuals with my experience; and because it was interpreted negatively by others, for example Ronald Graham who wrongly alleged that I had been institutionalized (per statement of Merritt Lake to EEO investigator).

43. As a result of the above, I experienced emotional distress over the negative implications, and I experienced anxiety because I had been provided no explanation or due process that would enable me to bring an end my forced exile.

44. While I was on administrative leave, in December, 2000, a few weeks after I participated in an employee civil rights demonstration, the Agency issued a proposal to remove me for the "efficiency of the service," falsely alleging that my duties required a security clearance and that my position required a clearance as a condition of employment.

45. Although I responded immediately with facts disputing the allegations, the Agency waited three years, until January, 2003, to issue a decision.

46. The Agency again denied due process in its handling of my appeal of its revocation of my security clearance, when it waited from January, 2000, to June, 2002, to provide the required hearing or "personal appearance," denied me the right to appear before a panel that would review my appeal, barred my expert attorney at the door, withheld evidence in its possession, arbitrarily excluded half of my evidence from the record, refused to provide a detailed explanation of the charges against me, and arbitrarily restricted my hearing to 90 minutes.

47. The Agency relied on its denial of due process regarding my security clearance to deny me a permanent promotion to Branch Chief, a position that, per restrictions in the announcement, logically included only current branch employees, and I was the only employee in the branch with a specialized degree in emergency planning and extensive experience with it's

two largest programs, the Radiological Emergency Preparedness Program (REP) and the Chemical Stockpile and Emergency Preparedness Program (CSEPP) programs.

48. The Agency ultimately promoted to Branch Chief, Robert Conley, a male employee, and Lori Thomas, a younger female employee, who had no known record of prior protected activity, and lacked Plaintiff's specialized preparedness degree and experience with the CSEPP program; moreover, Mr. Bickerton, who reportedly still controlled activities of the Branch, had brought Ms. Thomas on staff because, as he explained to me, he was certain she would never file an EEO complaint regardless if discrimination occurred.

49. My applications for other positions also were denied and the Agency refused ever to provide any documentation, as I requested, regarding its handling of the application process, nor has it credibly explained why it posted a position, for which I twice applied and was well-qualified, and then re-posted the same position, for which I again applied, but was never hired.

50. The Agency promoted younger males and females, for example Ronald Graham, who was younger and male, who had lesser qualifications in emergency preparedness, for example no preparedness degree or similar experience in the CSEPP program, and without requiring them to go through a competitive process.

51. I was denied activities appropriate to my grade that I had successfully performed, such as CSEPP planning and policy advising, in favor of male employees like Matthew Powers and Ronald Graham who had much less experience with the program.

52. Other employees on the staff, who were older females and had real or perceived disabilities, and also reported to supervisors Carol Maczka and Perfecto Santiago, told me that they, too, were marginalized and felt pressured to leave their positions; this included Dr. Karen Wesson and secretary Betty Barrett.

53. Approximately in late 2004, the Agency conducted an interviewed branch employees about possible discrimination and reportedly received multiple complaints that discrimination was a problem; the Agency's report believably would support my claims of discrimination.

54. In late 2005, the Agency's internal affairs office conducted an investigation that, based on questions to me, centered on supervisor Carol Maczka's management, and obtained statements from other staff members, including Dr. Karen Wesson and Lori Thomas, who complained to me of discrimination and failure to accommodate a disability by Dr. Maczka..

55. The Agency's reprimand of the Plaintiff for late payment of a credit card violated due process and procedural requirements described in the Agency's own guidance on credit cards; for example, the Agency issued the reprimand without allowing me to dispute or explain late payments, or to provide evidence of mitigating factors, and the agency offered no credible, non-discriminatory explanation.

56. In this and other instances, the Agency assumed that I was guilty prior to providing an opportunity to provide evidence, whereas the Agency immediately defended male coworkers, like Ronald Graham and Robert Conley, who were named in my EEO complaints, but were promoted.

57. I was denied protections of the First Amendment when George Bickerton prevented me from speaking at a public meeting on or about December, 1997, and when the Agency revoked my clearance after I wrote to members of Congress about agency discrimination and dangerous neglect, and on other occasions.

58. In response to a continuing pattern of discrimination, retaliation for protected civil rights activities and other abuses, I filed civil rights (EEO) complaints with the Agency, including, but not restricted to the following:

59. Agency Complaint Number 970252, filed September 10 and November 14, 1996, citing, but not limited to, lack of assignments compared to male coworkers Ronald Graham and Robert Conley, discriminatory treatment at an October, 1996 exercise, and retaliation;

60. Agency Complaint 990200, citing but not limited to, the Agency's issuance of an unjustified July 9, 1998 proposal of reprimand, and twice re-issued on the eve of major holidays on November 19 and December 11, 1998, to no purpose except to cause emotional distress for the Plaintiff;

61. Agency Complaint Number 990986, citing, cut not limited to, Agency's issuance of a retaliatory reprimand and violations of due process in the agency's investigation;

62. Agency Complaint Number 00187, citing, but not limited to, Agency's placement of the Plaintiff on administrative leave with no explanation days after Plaintiff complained of discrimination and filed an EEO complaint;

63. Agency Complaint Number 98005, filed approximately in May, 1997, citing supervisor threats, denied training, and disparagement by male coworkers;

64. A Complaint filed May 14, 2004, citing the Agency's failure to control a personnel file containing references to the Agency's order for a mental status exam, and allegations that I was crazy and a threat to others;

65. A Complaint filed December 10, 2004, citing, but not limited to a reprimand issued without due process;

66. A complaint filed March 8, 2005, citing, but not limited to Agency's failure to hire or even respond to my applications for a Physical Scientist Position that was announced twice (for which I applied twice).

67. Complaint Numbers 990986, 990200, and 000187 were consolidated for Agency investigation, and all complaints with the exception of 98005 were consolidated into EEOC Complaint #100-A1-7163X.

68. An EEOC Decision (Appeal #01A10033) dated February 12, 2003, ordered consolidation of Agency Complaint Number 980005 with complaints previously consolidated as #100-A1-7163X, or in the alternative, Plaintiff could file 980005 in U.S. District Court.

69. An Individual Right of Appeal, on my whistleblower claims was filed with the MSPB on April 11, 2003.

70. Based on the EEOC's February 12 decision letter, complaint 98005 was filed by my attorney as a civil complaint, 03-1027 (GK), Lewis v. Veneman, in U.S. District Court for the District of Columbia on May 9, 2003.

71. My attorney never notified me that he had failed to serve the Complaint or that it was dismissed, without prejudice, for failure to prosecute.

72. In an October 21, 2003, order, the EEOC remanded #100-A1-7163X to the Agency, pending MSPB decision and instructed USDA to notify me of my appeal rights; in the interim, my attorney abandoned his responsibilities and I was effectively without representation;

73. On May 14, 2004, I pro se filed my complaint alleging that the agency failed to control highly sensitive personnel records including Agency orders for a mental status exam and supervisor notes alleging that I was crazy and a threat to coworkers.;

74. On May 30, 2004, the MSPB issued an Initial Decision, wherein Judge Bogle ruled, "In summary, because appellant has not made non-frivolous allegations that she engaged in whistleblowing activity by making a protected disclosure, and the disclosure was a contributing factor in a covered personnel action, she has not established the Board's jurisdiction over her IRA appeal."

75. The MSPB issued its final decision on July 22, 2004, supporting its earlier decision.

76. Based on past USDA delay in processing complaints and issuing decisions - for example, its delays of two years or more in action on my appeal of its proposal to removal me and its revocation of my security clearance - I had reason to expect that USDA could take equally long to act on the EEOC's remand order, which ordered the Agency to tell me my appeal rights and was triggered by the July 22 MSPB decision.

77. After several months had passed with no word, I called USDA's civil rights office and inquired about the status of the remanded consolidated complaints, but was unable to obtain any information.

78. USDA never notified me of my appeal rights as instructed by the EEOC's Judge Schneider prior to March 26, when I received the Agency's FAD. See Attach. 1.

79. On April 15, 2005, the Agency issued a right to sue letter regarding my May 14, 2004 complaint.

80. Convinced that the Agency had no intention of ever addressing the remand, I filed my previously consolidated complaints, for judicial efficiency, with the May 14, 2004 complaint in the U.S.District Court for the District of Columbia, on July 29, 2005, as 05-1507 (GK).

81. In February, my December 10 complaint was in discovery, before the EEOC, and I was deeply concerned about irregularities in the proceedings that included (1) *ex parte*

13

discussions between the judge and USDA's representative, (2) USDA's failure to respond at all to my written discovery requests, and (3) the judge's failure to promptly respond to my request to compel USDA to make witnesses available for deposition.

82. In consideration of the above, I filed the December 10 complaint in U.S. District Court for the District of Columbia on February 13, 2006. See Complaint 06-0255 (GK), and included a complaint filed March 8, 2005, which also was more than 180 days old..

83. I timely filed my complaint on May 14, as indicated by the time on my copy of the fax and the one produced by the Agency.

84. In later correspondence, I relied cited a date of May 27 only because the Agency erroneously included that date in its most recent correspondence; I promptly corrected the error, in a communication to Arthur Simmons, after I compared the Agency's correspondence with my own, original complaint.

85. In addition to faxing a written complaint, I called the Agency EEO office and verbally informed them that I was filing an EEO complaint.

86. The Agency's claim that I late filed a formal complaint is unfounded because the clock does not begin running until a plaintiff receives the notice, and it was delayed, on that and other occasions, because the agency sent it to an old address.

87. To my knowledge and belief, I filed every complaint within the appropriate number of days from receipt of notice.

88. I timely filed a December 10, 2004, complaint, but, when I did not receive a hearing or even a response to my properly filed discovery requests, I filed the Complaint in U.S. District Court, on February 13, 2006, along with a complaint filed on March 8, 2005, which also was more than 180 days old.

I, Linda Lewis, do hereby declare under penalty of perjury that the foregoing affidavit, and the attached documents, are true and correct to the best of my knowledge and belief.

Signed,

_Linda M. Lewis_       _March 29, 2007_
Linda M. Lewis      Date
2400 Wynncrest Cir. #10105
Arlington, Texas 76006
(202) 210-8539


Witnessed by

_Michelle R. Peterson_      _3-29-07_
     Date

MICHELLE R. PETERSON
MY COMMISSION EXPIRES
May 30, 2010